## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Xinkang Shui, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>XCERRA CORPORATION, ROGER W. BLETHEN, DAVID G. TACELLI, MARK S. AIN, ROGER J. MAGGS, JORGE TITINGER, and BRUCE R. WRIGHT,<br><br>Defendants | **Case No.: 1:18-cv-11529**<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Xinkang Shui ("Plaintiff"), on behalf of himself and all others similarly situated, by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

### <u>NATURE OF THE ACTION</u>

1.      This is a class action brought by Plaintiff on behalf of himself and all other similarly situated public shareholders of Xcerra Corporation ("Xcerra" or the "Company") against Xcerra and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants," and, together with Xcerra, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78n(a) and 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, in connection with the acquisition of Xcerra by Cohu, Inc.

("Cohu") through a transaction as alleged in detail herein.

2.      On May 7, 2018, Cohu, Xavier Acquisition Corporation, a wholly owned subsidiary of Cohu ("Merger Sub"), and Xcerra entered into an agreement and plan of merger (the "Merger Agreement"), pursuant to which Merger Sub will merger with an into Xcerra, with Xcerra continuing as the surviving corporation and a wholly owned subsidiary of Cohu (the "Proposed Transaction").

3.      Pursuant to the terms of the Merger Agreement, each share of Xcerra's common stock issued and outstanding will be converted into the right to receive (i) $9.00 in cash, without interest, and (ii) 0.2109 shares of common stock of Cohu (the "Merger Consideration"). Accordingly, if the Proposed Transaction is consummated, Xcerra shareholders will only own approximately *28%* of Cohu's outstanding common stock.

4.      As discussed below, the Merger Consideration appears inadequate, and the process by which Defendants agreed to consummate the Proposed Transaction is fundamentally unfair to Plaintiff and Xcerra's other public shareholders.

5.      On June 21, 2018, in order to convince Xcerra's public common shareholders to vote in favor of the Proposed Transaction, Defendants authorized the filing of a materially incomplete and misleading Form S-4 Registration Statement (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

6.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for Xcerra and Cohu; (ii) the valuation analyses performed by Xcerra's financial advisor, Cowen and Company, LLC ("Cowen"), in support of their fairness opinion; and (iii) the background process leading to the Proposed Transaction.

7.      The special meeting of Xcerra's shareholders to vote on the Proposed Transaction

is forthcoming, as the Proposed Transaction is expected to be completed in the fourth calendar quarter of 2018. It is therefore imperative that the material information that has been omitted from the Proxy is disclosed prior to the shareholder vote so Xcerra shareholders can properly exercise their corporate suffrage rights.

8.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Xcerra's public common shareholders sufficiently in advance of the upcoming shareholder vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

10.     This Court has jurisdiction over the Defendants because each Defendant is either a corporation that conducts business and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff's claims arose in this District, where a substantial portion of the actionable conduct took place, where most of the documents are electronically stored, and where the evidence exists. Xcerra is headquartered in Massachusetts, and has designated this district as an exclusive forum. Moreover,

each of the Individual Defendants, as Company officers or directors, either resides in this District or has extensive contacts within this District.

## PARTIES

12.     Plaintiff is, and has been at all times relevant hereto, a common shareholder of Xcerra.

13.     Defendant Xcerra is a Massachusetts corporation with its principal executive offices and global headquarters are located at 825 University Avenue, Norwood, Massachusetts 02062.  The Company is a global provider of test and handling capital equipment, interface products, test fixtures and related services to the semiconductor and electronics manufacturing industries.  Xcerra common stock is traded on the NASDAQ under the ticker symbol "XCRA."

14.     Defendant Roger W. Blethen is, and has been at all relevant times, a director of Xcerra, and currently serves as the Chairman of the Board.

15.     Defendant David G. Tacelli is, and has been at all relevant times, a director of Xcerra, and currently serves as the Company's President and Chief Executive Officer ("CEO").

16.     Defendant Mark S. Ain is, and has been at all relevant times, a director of Xcerra.

17.     Defendant Roger J. Maggs is, and has been at all relevant times, a director of Xcerra.

18.     Defendant Jorge Titinger, and has been at all relevant times, a director of Xcerra.

19.     Defendant Bruce R. Wright is, and has been at all relevant times, a director of Xcerra.

20.     The parties in paragraphs 14 through 19 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with Xcerra, the "Defendants."

## CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Xcerra (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

22.     This action is properly maintainable as a class action because:

(a)     the Class is so numerous that joinder of all members is impracticable.  As of June 5, 2018, there were 54,914,881 shares of Xcerra common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country.  The actual number of public shareholders of Xcerra will be ascertained through discovery;

(b)     there are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i.     whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy, in violation of Section 14(a) of the Exchange Act;

ii.     whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iii.     whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading Proxy.

(c)    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

(d)    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

(e)    the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

(f)    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

(g)    a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## **SUBSTANTIVE ALLEGATIONS**

**I.    Company Background and the Proposed Transaction**

23.    Xcerra is a global provider of test and handling capital equipment, interface products, test fixtures and related services to the semiconductor and electronics manufacturing industries.

24.    The Company Xcerra designs, manufactures and markets products and services that address the broad, divergent requirements of the mobility, industrial, medical, automotive and consumer end markets, offering a comprehensive portfolio of solutions and technologies and a global network of strategically deployed applications and support resources.

25.     Cohu is a leading supplier of semiconductor test and inspection handlers, micro-electro mechanical system (MEMS) test modules, test contactors and thermal sub-systems used by global semiconductor manufacturers and test subcontractors.  Cohu develops, manufactures, sells and services a broad line of equipment capable of handling a wide range of integrated circuits and light-emitting diodes (LEDs).

26.     On May 8, 2018, Xcerra and Cohu issued a joint press release announcing the Proposed Transaction.  The press release stated, in relevant part:

### Cohu to Acquire Xcerra Creating Global Leader in Back-end Semiconductor Equipment

***Immediately Accretive Transaction Diversifies Revenue Base and Increases TAM to ~ $5 Billion***

- *Combined last twelve months ("LTM") reported revenue of approximately $828 million and non-GAAP operating income of approximately $124 million*

- *Complementary acquisition expected to create diversified revenue base and expand addressable market to $5 billion*

- *Increases footprint in high growth end-markets of automotive, IoT, industrial and mobility*

- *Estimated to deliver over $20 million in annual run-rate cost synergies within 2 years*

- *Expected to be immediately accretive to non-GAAP earnings per share after closing*

POWAY, Calif., and NORWOOD, Mass., May 8, 2018 — Cohu, Inc. NASDAQ: COHU), and Xcerra Corporation (NASDAQ: XCRA) today announced they have entered into a definitive merger agreement pursuant to which Cohu will acquire Xcerra for a combination of cash and stock. The acquisition is expected to make Cohu a global leader in semiconductor test, with combined sales for Cohu and Xcerra in excess of $800 million for the last twelve months.

Upon the closing of the transaction, Xcerra shareholders will be

entitled to receive $9.00 in cash and 0.2109 of a share of Cohu common stock, subject to the terms of the definitive agreement. Based on the closing price of Cohu common stock as of May 7, 2018, the transaction values Xcerra at $13.92 per share, or approximately $796 million in equity value, with a total enterprise value of approximately $627 million, after excluding Xcerra's cash and marketable securities net of the debt on its balance sheet as of January 31, 2018. The transaction value represents a premium of 8.4% to Xcerra's closing price on May 7, 2018, and a premium of 15.4% to Xcerra's 30-day average closing price.

"This proposed acquisition is a powerful combination of two complementary companies that will accelerate our strategy to diversify our product offerings and strengthen Cohu's position as a global leader in back-end semiconductor equipment. The depth and breadth of the combined product portfolios, engineering and product development resources, as well as the global customer support platforms will enable us to deliver comprehensive semiconductor back-end solutions that better meet the future needs of our customers," commented Luis Müller, Cohu's President and CEO.

Mr. Müller continued, "The acquisition of Xcerra increases our addressable market to approximately $5 billion across handlers, contactors, test and inspection, further strengthening our ability to fully capitalize on the secular growth opportunities in the automotive, IoT, industrial and mobility markets. We are excited to welcome the Xcerra team to Cohu and look forward to an efficient completion of the transaction, with a focus on delivering long-term value to our customers, employees and shareholders."

Commenting on the proposed acquisition, David Tacelli, Xcerra's President and CEO, stated, "We are very pleased to be joining forces with Cohu to create a global leader in back-end semiconductor test. Together, we will be an even stronger and more competitive company with far reaching long-term benefits to our customers and employees. I am extremely proud of what the Xcerra team has accomplished over the past several years and look forward to the exciting possibilities we can achieve together with Cohu."

The transaction is expected to be immediately accretive to non-GAAP earnings per share and generate over $20 million of annual run-rate cost synergies within 2 years of closing, excluding stock-based compensation and other charges.

**Transaction Details**

> Cohu intends to fund the cash payable to Xcerra shareholders with a combination of cash on hand from the combined companies' balance sheets and approximately $350 million in debt financing. The transaction is expected to close in the second half of calendar year 2018, subject to approval by both companies' respective shareholders, antitrust regulatory approvals and other customary closing conditions.
>
> Xcerra shareholders are expected to own approximately 30% of the combined company upon the closing of the transaction. The transaction has been unanimously approved by the Boards of Directors of both companies.[1]

27.   The Merger Consideration the Company's shareholders stands to receive if the Proposed Transaction is consummated is unfair and inadequate because, among other things, the intrinsic value of the Xcerra is materially in excess of the amount offered given the Company's prospects for future growth and earnings.

28.   For example, on February 22, 2018, Xcerra announced its Second Quarter 2018 Financial Results.  During the Company's earning call, Dave Tacelli, Xcerra's President and CEO commented:

> In the past four months, we paid off our loans to Silicon Valley Bank of 19 million, leaving us ***a cash value on the balance sheet of a 171 million***. The only remaining long-term debt we have is a small mortgage in Germany. ***So when you look at the 171 million that's almost a net number.***
>
> ***From an overall growth standpoint, the total company, we're up 38% over the past 12 months***. And as I said earlier, share gains in all products that contributed to that and outlook remains very positive as we go through 2018 in a wide variety of areas not only in semiconductor tests, but also PCB test, contacting solutions as well.
>
> Getting more specific in the semiconductor test solutions business that's up 43% over the past 12 months, contributing to this is the

---

[1]   Xcerra Corporation, Current Report (Form 8-K), at Exhibit 99.1 (Joint Press Release of Cohu, Inc. and Xcerra Corporation, dated May 8, 2018) (May 8, 2018).

rollout and additional instrumentation that we put on Diamondx and growth into specific regions or specific products. We've seen growth in Japan, we seen growth in market segments like flat panel display, automotive, industrial and mobility.

We've launched multiple new sensor applications for InMEMS solution, we see more customers going to volume, on our 2168 pick-and-place handler and our xWave products specifically for millimeter wave have really taken whole and we are the now dominant supplier for that market segment.

If you look at this chart, this chart compares our growth over the past calendar year, which is the bar on the far left. The bottom center is the growth of our closest competitor in that space and the bottom and far right is the market growth of that individual segment. You can see in all three cases, whether the SoC test, handling of contactors *we've not only outgrown our competitor but outgrown the market growth for these market segments in side SCS, so strong performance setting us up for a very good 2018 and beyond*.[2]

29.     During the call, Mark Gallenberger, Xcerra's Chief Financial Officer, Senior Vice President, and Chief Operating Officer also commented on the Company's optimistic future:

> ***Our revenue and our non-GAAP EPS was Xcerra's highest for any fiscal Q2,*** which is typically our seasonally weak period. We have revenues of $110 million, gross margins of 45.8% and our EPS on a non-GAAP basis was $0.19 per share. Additionally, we also generated positive EBITDA of approximately $16.6 million or 15% of revenue.
>
> Our cash flow from operations was approximately $30 million which allowed us -- allowed our net cash to grow approximately $28 million from the prior quarter. And so our net cash balance is approximately $168 million. As a result of the strong cash flow, we also made the decision within the quarter to pay down the term loan with Silicon Valley Bank. That was approximately $19 million, and that's going to save the Company approximately $650,000 in annual interest expense.
>
> ***In terms of our performance on a year-over-year basis, our***

---

[2]     *Xcerra's (XCRA) CEO Dave Tacelli on Q2 2018 Results - Earnings Call Transcript*, Seeking Alpha (February 26, 2018), *available at* https://seekingalpha.com/article/4150613-xcerras-xcra-ceo-dave-tacelli-q2-2018-results-earnings-call-transcript?part=single (emphasis added).

*revenues grew 38%* from $80 million last fiscal year or last year in the same time period up to $110 million this quarter. Our EBITDA also grew to $16.6 million versus $5.2 million in the prior year quarter. And our non-GAAP EPS grew substantially from $0.07 a year to $0.19 on a non-GAAP basis.

Looking at our performance over a trailing 12-month period, as Dave had mentioned, *our year-over-year performance grew 38%.*[3]

30.    Mark Gallenberger also took the opportunity to comment on the Company's Third Quarter outlook, stating that revenue is "expected to be in the range of the 110 million to 115 million." *Id.*

31.    On February 23, 2018, CVC Research stated that Xcerra's failed merger with Sino IC Capital was "great news," nothing that the Company "has been growing Y/Y for six consecutive quarters and, in particular, over the last four quarters has seen top line growth accelerate materially higher and operating margins lift into the double digits."[4]  Indeed, the article went to highlight that "[u]sing the 14x EPS (ex-cash) merger price/comparable multiple would *value the stock at $17.80* today, which would represent a massive 88% upside," and that even a more conservative "10x-12x FY18 EPS (ex-cash) [results in] a *target range of $13.60-$15.70*, or 44%-66% upside." *Id.*

32.    On April 17, 2018, Needham upgraded its outlook on Xcerra stock "from Hold to Buy with a *$16 price target*, a 28% upside to yesterday's close.  [Needham] cites the expected upside to estimates, Xcerra's participation in long-term secular growth in the auto/industrial markets, and the current low valuation."[5]

---

[3]    *Id.* (emphasis added).

[4]    *Xcerra: Merger Failure Is Great News For Investors*, Seeking Alpha (February 23, 2018), *available at* https://seekingalpha.com/article/4150005-xcerra-merger-failure-great-news-investors.

[5]    *Needham upgrades Xcerra to 28% upside*, Seeking Alpha (April 17, 2018), *available at* https://seekingalpha.com/news/3346101-needham-upgrades-xcerra-28-percent-upside.

33.     On May 23, 2018, the Company announced its Third Quarter results, and demonstrated its continued success.  Exceeding expectations set back in February, the Company announced revenue of $115.72 million, which represented an 11.7% increase in year-over-year performance.[6]

34.     As seen above, Xcerra has demonstrated considerable growth in 2018.  As a result, it is imperative that Defendants disclose the material information they have omitted from the Proxy, discussed in detail below, so that the Company's shareholders can properly exercise their corporate suffrage rights and make an informed decision concerning whether to vote in favor of the Proposed Transaction.

**II.     The Materially Incomplete and Misleading Proxy**

35.     On June 21, 2018, the Defendants filed a materially incomplete and misleading Proxy with the SEC and disseminated it to Xcerra's shareholders.   The Proxy solicits the Company's shareholders to vote in favor of the Proposed Transaction.  Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents or omits material information that is necessary for the Company's shareholders to make an informed voting decision in connection with the Proposed Transaction.

### *Material Omissions Concerning Xcerra and Cohu's Financial Projections*

36.     First, the Proxy fails to provide Xcerra's unlevered free cash flow projections.[7]

---

[6]     *Xcerra Announces Third Quarter Results*, Seeking Alpha (May 23, 2018), *available at* https://seekingalpha.com/pr/17171673-xcerra-announces-third-quarter-results.

[7]     Unlevered free cash flows are used to determine a company's enterprise value. The unlevered free cash flow allows investors to ascertain the operating value of a company independent of its capital structure. This provides a greater degree of analytical flexibility and allows for a clearer

Xcerra's unlevered free cash flows were utilized by Cowen in their valuation analyses, including their discounted cash flow ("DCF") analysis for Xcerra, and are material to the Company's shareholders.  Indeed, investors are concerned, perhaps above all else, with the unlevered free cash flows of the companies in which they invest.  Under sound corporate finance theory, the market value of a company should be premised on the expected unlevered free cash flows of the corporation.  Accordingly, the question that the Company's shareholders need to assess in determining whether to vote in favor of the merger is clear – is the Merger Consideration fair compensation given the expected unlevered free cash flows?  Without unlevered free cash flow projections, the Company's shareholders will not be able to answer this question and assess the fairness of the Merger Consideration.

37.    Similarly, the Proxy also fails to disclose Cohu's unlevered free cash flow projections.  *See* Proxy at 121.  Cohu's unlevered free cash flows were also utilized by Cowen in their valuation analyses, including their DCF analysis for Cohu, and are material to the Company's shareholders.   As mentioned above, investors are concerned, perhaps above all else, with the unlevered free cash flows of the companies in which they invest.  Under sound corporate finance theory, the market value of a company should be premised on the expected unlevered free cash flows of the corporation.  Accordingly, the question that the Company's shareholders need to assess in determining whether to vote in favor of the merger is clear – is the Merger Consideration fair compensation given the expected unlevered free cash flows *of the company that Xcerra will be merging with*?  Indeed, complete disclosure of Cohu's expected unlevered free cash flows is particularly material in light of the fact that the Merger Consideration is comprised of stock in

---

picture of the value of the company overall. For this reason, unlevered free cash flows are routinely used to value a company, especially in merger contexts.

another company: Cohu.  Without Cohu's unlevered free cash flow projections, the Company's shareholders will not be able to assess the fairness of the Merger Consideration.

38.     The projections included in the Proxy disclose Adjusted EBITDA for both Xcerra and Cohu, but fails to include projections for each company's expected unlevered free cash flows. Adjusted EBITDA is not a sufficient alternative to unlevered free cash flows—as Warren Buffet and other financial experts have stated: "References to EBITDA make us shudder.  Too many investors focus on earnings before interest, taxes, depreciation, and amortization.  That makes sense, only if you think capital expenditures are funded by the tooth fairy."[8]  Relying on Adjusted EBITDA to provide a fair summary of a company's financial prospects has numerous pitfalls. Adjusted EBITDA does not take into account any capital expenditures, working capital requirements, current debt payments, taxes, or other fixed costs that are critical to understand a company's value.[9]  As a result of these material differences between Adjusted EBITDA and unlevered free cash flows, many experts recognize unlevered free cash flows as a much more accurate measure when it comes to analyzing the expected performance of a company.  Simply put, the unlevered free cash flow projections are material and merely supplying Adjusted EBITDA renders the projections included in the Proxy misleading.

39.     Additionally, the Proxy fails to provide "Xcerra's estimated United States federal and 18 state net operating loss carry forwards, as estimated and provided by the management of Xcerra," despite the fact that management provided them to Cowen to utilize in their valuation analyses.  *See* Proxy at 121.

---

[8]   Elizabeth   MacDonald,   *the   Ebitda   folly*,   FORBES   (March   17,   2003), http://www.forbes.com/global/2003/0317/024.html.

[9]   Cody Boyte, *Why EBITDA is Not Cash Flow*, AXIAL FORUM (Nov. 19, 2013), http://www.axial.net/forum/ebitda-cash-flow/.

40.    Numerous courts have championed the importance of management based financial projections because a company's management has unique insight into their firm's future that the market does not.   Shareholders cannot hope to replicate management's inside view of the Company's prospects.   The established case law shows the importance (and, hence, materiality) of financial projections to shareholders' decision-making.

41.    By electing to disclose *some* of Xcerra's projections, Defendants' obligated themselves to speak the **whole truth** regarding Xcerra's projections by providing **complete and accurate** projections because if a proxy discloses financial projections and valuation information, such **projections must be complete and accurate**, rather than cherry-picking favorable financial metrics to disclose.   The question here is not the duty to speak, but liability for not having spoken enough.   With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths.

### Material Omissions Concerning Cowen's Financial Analyses

42.    The Proxy describes Cowen's fairness opinion and the various valuation analyses it performed in support of its opinion.   However, the description of Cowen's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses.   Without this information, as described below, Xcerra's shareholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Cowen's fairness opinion in determining whether to vote their shares in favor of the Proposed Transaction.   This omitted information, if disclosed, would significantly alter the total mix of information available to Xcerra's common shareholders.

43.    With respect to Cowen's *Discounted Cash Flow Analysis* for Xcerra, the Proxy

fails to disclose: (i) Xcerra's projected unlevered free cash flow for the three-month period ending on July 31, 2018 and the full fiscal years ending in 2019 through 2022; (ii) the inputs and assumptions underlying the calculation of the discount rate range of 12.0% to 14.0%; (iii) Xcerra's estimated net loss carry forwards; and (iv) the inputs and assumptions underlying the selection of the 13.1% discount rate applied to Xcerra's estimated net loss carry forwards.  *See* Proxy at 121.

44.    With respect to Cowen's *Discounted Cash Flow Analysis* for Cohu, the Proxy fails to disclose: (i) Cohu's projected unlevered free cash flow for the eight-month period ending on December 31, 2018 and the full fiscal years ending in 2019 through 2022; and (ii) the inputs and assumptions underlying the calculation of the discount rate range of 9.5% to 11.5%.  *See* Proxy at 123.

45.    These key inputs are material to Xcerra's common shareholders, and their omission renders the summary of Cowen's DCF analyses for Xcerra and Cohu incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, "there is [] an element of subjectivity present in the choice and application of these [valuation] methods" and that the banker's key choices can have a substantial "effect the outcome of a valuation."  Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1573-74 (2006). Such choices include "the appropriate discount rate, and the terminal value…"  *Id.*  With respect to a discounted cash flow analysis, Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars…. This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  This dazzling variability makes it difficult to rely, compare, or analyze the valuations

underlying a fairness opinion *unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices*. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added).

46.     Similarly, with respect to Cowen's *Analysis of Xcerra Selected Transactions*, the Proxy fails to disclose the individual multiples Cowen calculated for each transaction utilized. The omission of these multiples renders the summary of the analysis and the implied value per share ranges materially misleading. A fair summary of the *Analysis of Xcerra Selected Transactions* requires the disclosure of the individual multiples for each transaction; merely providing the low, mean, median, and high multiples that a banker applied is insufficient, as shareholders are unable to assess whether the banker utilized the appropriate transactions and applied appropriate multiples, or, instead, selected certain transactions that yielded unreasonably low multiples in order to drive down the implied value per share ranges. Furthermore, the individual multiples have a heightened importance here because of several of the transactions were excluded because they were not available. Indeed, *half* of the transactions that Cowen selected were excluded when calculating the NTM Revenue, NTM Adjusted EBITDA, and NTM Non-GAAP EPS multiples, and *more than half* (eight out of the twelve) were excluded when calculating the LTM Non-GAAP EPS multiples. As a result, a fair summary of the *Analysis of Xcerra Selected Transactions* not only requires disclosure of the individuals, but also any benchmarking financial metrics of the selected transactions, as well as the objective selection criteria. *See* Proxy at 119-120.

47.     With respect to Cowen's *Analysis of Xcerra Selected Publicly Traded Companies* and *Analysis of Cohu Selected Publicly Traded Companies*, the Proxy fails to disclose the

individual multiples Cowen calculated for each company utilized.  *See* Proxy at 117-118, 121-123. The omission of these multiples renders the summary of the analysis and the implied value per share ranges materially misleading and incomplete.  A fair summary of the *Analysis of Xcerra Selected Publicly Traded Companies* and *Analysis of Cohu Selected Publicly Traded Companies* requires the disclosure of the individual multiples for each company; merely providing the low, mean, median, and high multiples that a banker applied is insufficient, as shareholders are unable to assess whether the banker utilized the appropriate companies and applied appropriate multiples, or, instead, selected certain companies that yielded unreasonably low multiples in order to drive down the implied value per share ranges.

### Material Omissions Concerning the Background Process Leading to the Proposed Transaction

48.     Finally, the Proxy states that on March 27, 2018, Xcerra and Cohu representatives engaged in discussions, which included key terms of the potential transaction between the two companies.  At the conclusion of the discussions, the parties each agreed that they would present to their respective boards of directors a proposal which, among other terms, included "that the post-closing board of directors of Cohu would include the addition of two former Xcerra directors."  *See* Proxy at 87.  While negotiations continued between Xcerra and Cohu over the following weeks, this proposal became a part of the Merger Agreement.  *See* Proxy at 95 ("[T]wo members of the Xcerra Board would be joining the current Cohu Board to form the Cohu Board at the Effective Time (the 'New Cohu Board') …").  However, the Proxy entirely omits any information concerning *who* are the two individuals that will be appointed to the New Cohu Board. Indeed, the Proxy explicitly states:

> To date, no member of Xcerra's management and no member of the Xcerra Board has engaged in any discussions with Cohu or any of its affiliates regarding the substantive terms, including

> compensation, of such person's continued employment with or service to Xcerra (*other than with respect to the two members of the Cohu Board to be designated by Xcerra as described in "— Board of Directors and Management after the Transaction"*) following the consummation of the Merger and each such person has agreed not to engage in any such discussions until after the Xcerra Special Meeting and Cohu Special Meeting have concluded.

*See* Proxy at 94-95 (emphasis added).  Such information is material to Xcerra shareholders so that they may understand the conflicts of interest facing management and the Board.  The timing and nature of post-close employment provides key insight concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's shareholders.  If the Board negotiated for their own interests ahead of shareholders compensation, shareholders would certainly find such information material.  Accordingly, the omission of this information renders the statements in the *Background of the Merger* and *Board of Directors and Management after the Transaction* sections of the Proxy materially incomplete and misleading.

49.     In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the upcoming shareholder vote concerning the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make an informed decision regarding whether to vote their shares in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 and 17 C.F.R. § 244.100 Promulgated Thereunder)**

50.     Plaintiff incorporate each and every allegation set forth above as if fully set forth herein.

51.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use

of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

52.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

53.     The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

54.     Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for Xcerra and Cohu; (ii) the valuation analyses performed by Xcerra's financial advisor, Cowen, in support of their fairness opinion; and (iii) the background process leading to the Proposed Transaction.

55.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were

therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

56.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that Cowen reviewed and discussed their financial analyses with the Board, and further states that the Board considered the financial analyses provided by Cowen, as well as its fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review Cowen's analyses in connection with their receipt of the fairness opinions, question Cowen as to their derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

57.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The

Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

58.     Xcerra is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

59.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.  Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### (Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)

60.     Plaintiff incorporate each and every allegation set forth above as if fully set forth herein.

61.     The Individual Defendants acted as controlling persons of Xcerra within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Xcerra, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and

dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

62.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

63.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.   The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

64.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

65.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

66.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate

result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

67.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.     Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

//

//

//

//

DATED: July 23, 2018

| | |
|---|---|
| | /s/ Mitchell J. Matorin |
| **OF COUNSEL** | **MATORIN LAW OFFICE, LLC** |
| | Mitchell J. Matorin (BBO# 649304) |
| **MONTEVERDE & ASSOCIATES PC** | 18 Grove Street, Suite 5 |
| Juan E. Monteverde | Wellesley, MA 02482 |
| Miles D. Schreiner | Tel: (781) 453-0100 |
| The Empire State Building | Fax: (888) 628-6746 |
| 350 Fifth Avenue, Suite 4405 | Email: mmatorin@matorinlaw.com |
| New York, NY 10118 | |
| Tel: (212) 971-1341 | *Attorneys for Plaintiff* |
| Fax: (212) 202-7880 | |
| Email: jmonteverde@monteverdelaw.com | |
|        mschreiner@monteverdelaw.com | |

*Attorneys for Plaintiff*